# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 19, 2014 Session

# IN RE ESTATE OF LINDA A. FARMER

**Appeal from the Circuit Court for Davidson County**
**No. 11P1469    David Randall Kennedy, Judge**

---

**No. M2013-02506-COA-R3-CV - Filed October 15, 2014**

---

This appeal arises from a civil action against the decedent's brother who allegedly used his confidential relationship as his sister's attorney-in-fact to unduly influence her to amend her revocable trust and name him the sole trustee and the sole beneficiary of the trust. It was also alleged that he breached his fiduciary duties by converting her assets. The claims were tried before a jury which returned a verdict in favor of the defendant; the jury found that the plaintiffs had not proven that the amendments to the decedent's revocable living trust were brought about by undue influence. The jury also found that the defendant had proven, by clear and convincing evidence, that under the totality of circumstances the trust amendments were not the result of undue influence by the defendant and were fair to the decedent. The jury's specific findings rendered all other claims moot; thus, the defendant prevailed on all issues. On appeal, the plaintiffs contend the trial court erred by, *inter alia*, not granting a directed verdict on the issue of breach of fiduciary duty and by failing to instruct the jury on certain issues; the plaintiffs also contend the jury verdict should be set aside because there is no material evidence to support the finding that the most recent amendment to the trust was fair to the decedent. We have determined there is material evidence to support the jury's findings; thus, the most recent trust amendment is valid and the defendant is the sole residuary beneficiary of the trust. Because there are sufficient funds in the trust to satisfy the modest cash bequests to the remaining beneficiaries, we find that plaintiffs have no standing to pursue their remaining claims on appeal due to their inability to show a "distinct and palpable injury." *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 55 (Tenn. Ct. App. 2004). Accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

John A. Beam, III, Andrew Christian Cameron, and Desiree J. C. Goff, Nashville, Tennessee, for the appellants, Doris Fay Parris and the Estate of Linda A. Farmer.

J. Ross Pepper and Mitchell Paul Ronningen, Nashville, Tennessee, for the appellee, Randy L. Farmer.

**OPINION**

This action was brought by the Estate of Linda A. Farmer and on behalf of the decedent's sister, Doris Fay Parris, against their brother Randy L. Farmer, who is alleged to have unduly influenced Linda Farmer in executing amendments to her revocable living trust, pursuant to which he was named the trustee and the sole residuary beneficiary; he is also alleged to have unduly influenced his sister Linda Farmer to execute a power of attorney naming him as her attorney-in-fact. Further, it is alleged that Randy Farmer breached his fiduciary duties as the trustee by converting trust assets and, as Linda's attorney-in-fact, by converting assets from Linda's bank accounts. The relevant facts leading up to this action are stated below.

Linda A. Farmer ("the decedent") lived with her mother, Marie Farmer, her entire life in Nashville, Tennessee. This was due in part to the fact that the decedent was born with Turner's syndrome, a condition that affected her physical development and impeded her ability to interact in social situations. The condition, however, did not prevent the decedent from maintaining gainful employment for much of her adult life as she worked for many years as a data entry clerk for the State of Tennessee. Because her mother provided all essentials, including room and board as well as transportation to and from work everyday, the decedent was able to save her earnings; by the time of her death, the decedent had almost a million dollars in assets, much of which she had placed in a revocable living trust that was created in 2004.

The decedent died on September 13, 2011, at the age of 64. She was survived by her mother, who died a few weeks later, and by two siblings, her brother Randy Farmer, who is the defendant in this action, and her sister Doris Parris, who is the individual plaintiff along with the estate. She was also survived by several nieces and nephews.

When the decedent created her revocable living trust in 2004, she placed substantial assets in the trust; specifically, a U.S. Bank account and a brokerage account at Cambridge Way Brokerage Securities. Pursuant to the 2004 trust agreement, she appointed herself as the sole trustee, and she named her brother, Randy Farmer, and two of her nieces, Vicky Gamble and Cheryl Pitt, as successor co-trustees. Upon the decedent's death, the trust assets were to be distributed as follows: her brother Randy Farmer was to receive 25%; her sister Doris

Parris was to receive 25%; and the remaining 50% was to be distributed equally among Mrs. Parris' children. The decedent also contemporaneously executed a power of attorney in 2004 by which she appointed her niece Vicky Gamble, one of Mrs. Parris' children, as her attorney-in-fact.

In the fall of 2006, the husband of Mrs. Parris died. As a result, Randy Farmer, who had been living in Florida with his wife, Nancy Farmer, for many years, returned to Tennessee for the funeral. They remained for approximately a month, during which time they stayed with the decedent and her mother. It was during this month-long stay when Mr. Farmer prepared an amendment to the 2006 trust, a new power of attorney, and a new will, each of which the decedent executed.[1] Pursuant to the 2006 trust amendment, Mr. Farmer was appointed the sole successor trustee. The 2006 amendment also directed that upon the decedent's death, her sister Mrs. Parris and her niece Vicky Gamble were each to receive a $5,000 cash distribution; the other nieces and nephews were to receive $1,000 each, and all remaining trust assets were to be distributed to Mr. Farmer as the sole residuary beneficiary of the trust. The 2006 amendment further specified that "I'm only leaving $5,000 to my sister Doris Parris, because she's been so well taken care of by her husband." The new power of attorney designated Mr. Farmer as the decedent's attorney-in-fact. In the 2006 will, Mr. Farmer was appointed the executor of the decedent's estate, and the will directed that, at her death, any assets of her estate shall be poured over into the trust.

Mr. Farmer then returned to Florida where he and his wife remained until the fall of 2007 when he again visited his mother's home. During this visit, Mr. Farmer determined that his mother and the decedent were in need of assistance, and they could not continue living alone without full-time assistance. Particularly, his mother's eyesight had worsened which prevented her from driving the decedent to and from work. In addition, the decedent was now experiencing severe back pain that prevented her from working; instead, she was drawing upon her accrued sick pay. Believing his mother and the decedent needed full-time care and attention, and because no other family member was willing or able to help, Mr. Farmer and his wife moved into the basement of his mother's home to provide full-time assistance.

The decedent and her mother paid for Mr. Farmer's moving expenses and to remodel the basement of the home so that he and his wife Nancy could live there. After the move, Mr. Farmer and his wife, a registered nurse, would take the decedent and her mother to their doctor's appointments, manage their medicine, prepare meals, and attend to their daily needs. Nancy made an appointment for the decedent to be examined by a neurologist to address her increased back pain, after which the decedent's back pain subsided substantially. Not long

---

[1]Randy Farmer did not engage an attorney; he scanned the documents in his computer and revised them to make the changes noted hereafter.

after Mr. Farmer and his wife moved into his mother's home, the decedent elected to retire. Thereafter, they continued to reside in his mother's home while the decedent and her mother supported them.

By 2008, Mr. Farmer began revising the decedent's financial holdings, including those in her trust. He consolidated most of the decedent's assets by closing her Cambridge Way brokerage account and transferring those assets into several E*Trade accounts in the name of the trust; specifically, he transferred the cash accounts to an E*Trade investment account and an E*Trade banking account in the name of the trust. He also rolled over her Cambridge Way IRA into an E*Trade IRA.

After establishing the E*Trade accounts for the decedent and her trust, Mr. Farmer began day-trading and managing those investments. He also possessed the debit card associated with the decedent's E*Trade bank account, which he used to pay for his and his wife's personal expenses. Mr. Farmer also made a series of broker-to-broker transfers from her E*Trade investment account into either his personal E*Trade account or an E*Trade account he had created for his daughter. Over a period of time, Mr. Farmer transferred $167,000 out of the decedent's account into his or his daughter's accounts. Despite these substantial transfers, the decedent always had more than sufficient funds needed for her welfare and support.

In November 2009, the decedent executed another amendment to her trust, a power of attorney, and will. These documents were executed with the assistance of counsel in the decedent's home in the presence of her mother, her sister Mrs. Parris, and her niece Vicky Gamble. Mr. Farmer and his wife were neither present nor aware of the execution of these documents. In the 2009 trust amendment, the decedent appointed herself as the trustee and her niece Ms. Gamble as the successor trustee, and restated the terms of her 2004 trust agreement, whereby upon the decedent's death, her sister and brother, Mrs. Parris and Mr. Farmer, each received a 25 percent share of the trust, and her nieces and nephews shared the remaining 50 percent of the trust. Ms. Gamble was designated as the decedent's attorney-in-fact and as the executor of her estate. The will distributed the residue of her estate into her trust.

A few months later, in February 2010, the decedent met privately with attorney Allison Thompson on two occasions prior to executing a third amendment to the decedent's revocable trust; the amendment was signed in the attorney's office. The 2010 amendment, which was the final amendment to the trust, revoked the 2009 amendment and republished the 2004 trust agreement subject to several amendments. Specifically, the decedent resigned as trustee and appointed her brother Mr. Farmer as the sole trustee; she also reinstated several small cash bequests to family members, including a $5,000 cash bequest to her sister Mrs.

Parris, and designated her brother Mr. Farmer as the sole residuary beneficiary of her trust.[2] Additionally, she executed a new power of attorney that appointed Mr. Farmer as her attorney-in-fact.

In the spring and summer of 2011, the decedent's health and that of her mother declined, during which time the decedent was in and out of the hospital repeatedly while her mother was receiving hospice care at home. The decedent passed away on September 13, 2011, at the age of 64. Her mother died two weeks later on September 25, 2011. Within days following the decedent's death, her will dated November 2009 was admitted to probate and letters testamentary were issued to her niece Vicky Gamble.

Contemporaneous with the opening of the decedent's probate estate, on September 30, 2011, Ms. Gamble and her brother Paul Parris, III, commenced this action in the name of their mother, Doris Fay Parris,[3] against Randy Farmer, individually, and as attorney-in-fact and as trustee for the decedent. The complaint alleged that Mr. Farmer committed the tort of conversion in his dealings with the decedent's bank accounts prior to her death, that he breached his fiduciary duty as the decedent's attorney-in-fact and trustee in dealing with her property, and that he unduly influenced the decedent in procuring amendments to her trust. The complaint clearly states that it was filed on behalf of Doris Fay Parris and the estate was not identified as a plaintiff; however, in subsequent proceedings, the trial court ruled that the Estate of Linda Farmer was also a plaintiff. Thus, the action proceeded with the Estate of Linda Farmer recognized as a plaintiff along with Mrs. Parris.

A jury trial was held from July 15-18, 2013. Several witnesses testified, including Vicky Gamble, her son John Gamble, and Carl Davis, who testified as an expert witness for the plaintiffs. Testifying for the defense were Randy Farmer, his wife Nancy Farmer, and attorney Allison Thompson. Thirty-five exhibits were introduced into the record, including the 2004 trust document, the 2006 trust amendment, the 2009 trust amendment, and the 2010 trust amendment; the 2004 power of attorney, the 2006 power of attorney, the 2009 power of attorney, and the 2010 power of attorney; the 2006 will and the 2009 will; and monthly statements from the E*Trade accounts from 2007-2011.

---

[2]In addition, the 2010 amendment deleted portions of the 2004 trust agreement that required an accounting and written notice to existing beneficiaries of changes to the document, as well as the beneficiaries' power to remove the trustee.

[3]Vicky Gamble and Paul Parris filed suit in their capacity as attorneys-in-fact for Mrs. Parris on her behalf. The opening paragraph of the complaint reads: "Comes now the Plaintiffs, Vicky Gamble and Paul Parris, III, in the name of Doris Fay Parris, and show to the Court as follows." The estate was not identified as a plaintiff.

Ms. Gamble testified that she and her mother, Mrs. Parris, shared a close relationship with the decedent and her mother throughout their lives. Ms. Gamble and Mrs. Parris lived nearby, and would frequently visit the decedent and her mother. Ms. Gamble testified that the decedent 's mother was very protective of the decedent, and she always wanted the decedent to live with her in her home. Ms. Gamble explained that the decedent was a special needs child due to Turner's syndrome and that she needed guidance paying bills and taking her medication. She further testified that the decedent was easily manipulated and unable to stand up to Randy Farmer's domineering demeanor. Ms. Gamble stated that, while the decedent could bathe and dress herself and work as a data entry clerk, she needed her mother to drive her to and from work. She further testified that the decedent suffered in social situations and was always trying to fit in.

During the month Mr. Farmer visited in the fall of 2006 following the funeral of the husband of Mrs. Parris, he prepared three documents for the decedent to execute, including the 2006 amendment to the trust, and the decedent executed all of the documents. Ms. Gamble stated that these documents were greatly unfair to her mother Mrs. Parris because of the close relationship shared between Mrs. Parris and the decedent. Ms. Gamble also explained that she began noticing several changes after Mr. Farmer and his wife moved into the decedent's home. She stated that Mr. Farmer would hinder Mrs. Parris' ability to socialize with the decedent and her mother by blocking emails and placing cameras throughout the house to monitor their activities. Ms. Gamble further stated that whenever she visited the decedent she would become intimidated and quiet when Mr. Farmer was present. Ms. Gamble also noticed that if the decedent did not agree with Mr. Farmer, he would become very loud, which forced the decedent to agree with him.

On cross-examination, Ms. Gamble acknowledged that her mother Mrs. Parris had over $3 million in assets. She also acknowledged that Mr. Farmer should expect to be paid for the services he rendered for the benefit of the decedent and his mother. She also admitted that the decedent was competent and understood what she was doing when she executed the 2010 trust, and that the decedent never lacked money for her daily needs.

Ms. Gamble's son, John Gamble, corroborated his mother's testimony. Specifically, he testified that the decedent had problems with reasoning and interacting socially. He also testified that when he visited the decedent and her mother in their home, the decedent would immediately get quiet and reserved when Mr. Farmer entered the room, and that any time their home life was mentioned the decedent would get very emotional.

Carl Davis, a certified public accountant, testified as an expert witness on behalf of the plaintiffs concerning Mr. Farmer's handling of the decedent's financial accounts during 2007-2011. After reviewing voluminous records he categorized the various transactions as

"questionable," "suspicious," or "highly suspicious," based on the location of the transaction (referring to the particular store and city) and amount. A collective exhibit was entered of the financial materials Mr. Davis analyzed, which included monthly statements of the decedent's E*Trade brokerage account and E*Trade bank account. The transactions he categorized as "highly suspicious," which totaled $200,000, were transactions made by Mr. Farmer from the decedent's brokerage account into either his own E*Trade account or his daughter's account. The transactions he categorized as "suspicious," which totaled $5,145.41, were made on the E*Trade bank account for car maintenance, veterinary care and grooming bills for pets, liquor, boating equipment, and out of state transactions. The remaining transactions on the bank account were categorized as "questionable," which totaled $23,344.96, and included purchases at Kroger, including several "cash back" transactions, as well as dentist bills, Comcast bills, Best Buy purchases, and the purchase of a mattress. On cross-examination, however, Mr. Davis stated that he could not tell the jury how much, if any, of the decedent's money had been lost due to transactions made by Mr. Farmer. He conceded that whether a particular transaction he considered suspicious depended on whether the decedent approved the transaction or benefitted from the transaction and admitted that he did not know if the decedent had approved or benefitted from the transactions. He also could not state that the decedent ever lacked the resources or money for anything or that she was ever denied access to her assets.

Mr. Farmer testified that the decedent was very independent and headstrong, which made it difficult to get along with her; however, he also acknowledged that she was socially inept due to her diagnosis of Turner's syndrome and that she was spoiled from living with their mother. He stated that their mother always took care of the decedent, and the decedent did not know how to cook, clean, or wash her clothes. He explained that even though he lived in Florida for several years prior to 2007, he would call the house weekly and visit once a year to see his family and help maintain his mother's home.

He testified that he moved back into the home in the fall of 2007 after discovering that his mother and the decedent needed assistance; he explained this was necessary because his mother did not want to go to a nursing home, and she did not want to be separated from the decedent. As a condition of moving into his mother's home, he explained that the decedent and their mother agreed to pay all of his moving expenses, the costs to remodel the basement, and all of his and his wife's living and personal expenses in exchange for taking care of them.

Mr. Farmer testified that he and his wife provided daily care for the decedent and his mother: they took them to doctors' appointments, bought their prescriptions, managed their medicine, went grocery shopping, and maintained the household. Mr. Farmer further explained the he installed cameras without audio throughout the house in order to check on

his mother who had a tendency to fall and leave things cooking on the stove. He testified that he never tried to prevent Ms. Gamble or her family from talking to or visiting with the decedent and his mother.

He testified that the decedent understood the value of her assets and savings and her various accounts, but that she was not fully aware of how to invest money. He testified that in May 2008, he and the decedent closed out her Cambridge Way trust account and IRA, and transferred the monies to an E*Trade brokerage account in the name of the trust and an E*Trade IRA. When he moved the Cambridge Way IRA to E*Trade, he changed the beneficiary from his mother to himself.

He testified that he transferred a total of $167,000 out of the decedent's E*Trade trust account into either his E*Trade account or an E*Trade account he created for his daughter. He testified that this was done in order to make investments that the decedent did not have to pay taxes on, and he characterized them as loans. He prepared tax returns for himself and his daughter, and paid taxes on the profits he made. He admitted that he gave his daughter a portion of the profits made on the loans. Mr. Farmer further testified that he always informed the decedent that he was making the loans, and that the terms of the trust allowed the trustee to make loans.

Mr. Farmer additionally testified that he day-traded with the decedent's brokerage account and with the money she lent him, and that he made $85,000 from 2008 until her death in 2011. He testified that the decedent never made any trades or transfers on her E*Trade accounts, and that he did everything with her consent. He also testified that the decedent signed an E*Trade authorization agreement allowing him access to her accounts online. He admitted that the decedent did not have the password to her accounts, but testified that he showed the decedent weekly profit and loss statements detailing the various trades and investments. He also testified that the decedent and her mother went over their statements every month, and that the decedent would balance her checkbook to the penny.

Mr. Farmer testified that he provided to the decedent a U.S. Bank debit card for her which she consistently used. He also testified that he and his wife used a debit card tied to the decedent's E*Trade bank account, with the decedent's permission, for their personal expenses. He stated that he used the debit card for a total of $5,279 for his personal use, which included liquor store purchases, cell phone bills, groceries, gas, and vet and grooming bills for his dog; the remainder of the transactions on the card were for the decedent's benefit, including groceries, prescription medication, dentist bills, a new mattress for her back, and computer purchases from Best Buy for the decedent.

Mr. Farmer's wife, Nancy, also testified. She explained that she and her husband decided to move in with the decedent and her mother in the fall of 2007 because they were in need of constant supervision, especially with their healthcare and medication. She stated that after she and her husband moved to Nashville in the fall of 2007, they took the decedent and her mother to their doctor's appointments and otherwise cared for them to the extent that neither she nor her husband could work because taking care of the decedent and her mother was a full-time job. On cross-examination, Nancy Farmer admitted that her husband allowed her to use the decedent's debit card to go shopping in New York and buy toys for her grandchildren.

At the close of trial, the plaintiffs moved the court to hold that Mr. Farmer held a confidential relationship with the decedent and that he breached his fiduciary duty. The court granted the motion in part by holding that Mr. Farmer held a confidential relationship and a fiduciary relationship with the decedent; however, the court declined to rule that Mr. Farmer breached his fiduciary duty, stating that this was a jury question. Accordingly, the court instructed the jury that Mr. Farmer owed a fiduciary duty to the decedent but that the jury would have to decide whether he breached his fiduciary duty to her.

In addition to the jury instructions, the jury was given several specific jury interrogatories to answer. The answers to the two most relevant interrogatories are as follows:

3. Has Defendant Randy L. Farmer proven by clear and convincing evidence that under the totality of circumstances the 2006 trust amendment to the Linda Annette Farmer Revocable Living Trust of 2004 for the personal benefit of Defendant Randy L. Farmer was not the result of undue influence and was fair to Linda A. Farmer (deceased)?

  X  YES    ____ NO

4. Has Defendant Randy L. Farmer proven by clear and convincing evidence that under the totality of circumstances the 2010 trust amendment to the Linda Annette Farmer Revocable Living Trust of 2004 for the personal benefit of Defendant Randy L. Farmer was not the result of undue influence and was fair to Linda A. Farmer (deceased)?

  X  YES    ____ NO

The jury also returned a verdict finding that the defendant Randy Farmer was not liable on any of the claims asserted against him. The plaintiffs filed motions for judgment as

a matter of law on the issues of breach of fiduciary duty and undue influence, or in the alternative, a motion for a new trial. Both motions were denied, and this appeal followed.

## ISSUES

Plaintiffs present several issues for our review, many of which challenge the validity of transactions by Mr. Farmer that are alleged to be in violation of his fiduciary duties to the decedent and/or the result of his undue influence over the decedent. On appeal, Mr. Farmer contends that the plaintiffs lack standing to pursue most of the issues presented because they are rendered moot by the jury's determination that the 2010 trust amendment is valid. This is because the plaintiffs do not challenge the validity of the decedent's last will and testament which directs that all assets passing under the will pour over into the Linda Annette Farmer Revocable Living Trust, the 2010 trust amendment names Randy Farmer as the sole residuary beneficiary, and the trust has sufficient assets to fund the modest cash bequests to other trust beneficiaries. Thus, Mr. Farmer contends the dispositive issue is whether the 2010 amendment to the decedent's trust is valid.

Accordingly, we shall first focus on the plaintiffs' challenges to the validity of the 2010 trust. The plaintiffs contend that "a presumption of invalidity arises as a matter of law with regard to the execution of the 2010 trust amendment," that the court erred in not instructing the jury that it must find that the decedent received independent advice in signing the 2010 trust, and that Mr. Farmer failed to carry the burden of proving that the 2010 trust amendment was fair to the decedent by clear and convincing evidence as a matter of law. Each of these contentions are derivative of the doctrine of undue influence as it pertains to confidential relationships; thus, our analysis starts there.

## ANALYSIS

### I. THE DOCTRINE OF UNDUE INFLUENCE

"Courts apply the doctrine of undue influence 'when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship.'" *In re Estate of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008) (quoting *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983)). The underlying theory of the doctrine of undue influence is that the donor was induced by various means to execute an instrument that, in reality, was the will of another substituted for that of the donor. *DeLapp v. Pratt*, 152 S.W.3d 530, 542 (Tenn. Ct. App. 2004). Undue influence "consists of exerting enough influence or pressure to break down a person's will power and to overcome a person's free agency or free will so that the person is unable to keep from doing what he or she would not otherwise have done."

*Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 301 (Tenn. Ct. App. 2001) (citing *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993); *Hollis v. Thomas*, 303 S.W.2d 751, 758 (Tenn. Ct. App. 1957)). "Courts should exercise the utmost care and caution before concluding that the solemn act of a decedent, such as execution of a deed or will, should be invalidated; but, it is equally important that they be vigilant to prevent imposition upon those who are weak, frail, and vulnerable to the influence and importunities of others who exercise a dominant position over them." *Richmond v. Christian*, 555 S.W.2d 105, 109 (Tenn. 1977).

In Tennessee, where there is a confidential relationship between parties, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises that may only be rebutted by clear and convincing evidence of the fairness of the transaction. *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (citing *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)). Moreover, "a confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." *Childress*, 74 S.W.3d at 328-29 (citing *Matlock*, 902 S.W.2d at 386); *see also In re Estate of Hamilton*, 67 S.W.3d at 793; *Mitchell*, 779 S.W.2d at 389.

"Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence." *Childress*, 74 S.W.3d at 328 (citing *Matlock*, 902 S.W.2d at 386; *Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979)). In other words, the party trying to rebut the presumption of undue influence must establish by clear and convincing evidence "that the transaction was fair and not procured through undue influence." *Parish v. Kemp*, No. W2007-02207-COA-R3-CV, 2008 WL 5191291, at *5 (Tenn. Ct. App. Dec. 11, 2008); *see also In re Estate of Turner*, No. W2004-02123-COA-R3-CV, 2005 WL 2086028, at *8 (Tenn. Ct. App. Aug. 30, 2005) ("the burden shifts back to the defendants to show the absence of undue influence").

The trial court correctly found that a confidential relationship existed between Randy Farmer and the decedent as a matter of law because Mr. Farmer had exercised his authority as the decedent's attorney-in-fact prior to the decedent executing the 2010 amendment. *See Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009) (stating that the execution and exercise of a power of attorney establishes a confidential relationship between the attorney-in-fact and the grantor of the power). The parties do not dispute that a confidential relationship existed; however, the plaintiffs contend that the trial court erred by failing to additionally direct the jury that the 2010 trust amendment was presumed to be invalid. The plaintiffs insist an instruction that the 2010 trust amendment was invalid was required once the court found that Mr. Farmer had a confidential relationship with the decedent. We disagree, finding that the plaintiffs misconstrue the applicable presumption that arises once

it is established that a confidential relationship exists. Further, the plaintiffs fail to acknowledge that a confidential relationship alone does not render the resulting documents invalid as a matter of law; this is because other factors are to be considered, which are discussed below.

The mere fact the trial court determined that a confidential relationship existed does not render invalid any amendment the decedent executed under which Mr. Farmer may have benefitted. To the contrary, once the confidential relationship between the decedent and Mr. Farmer was established, without more, all that occurred was that a rebuttable presumption of undue influence arose, which shifted the burden of proof upon the dominant party, in this case Mr. Farmer. *Childress*, 74 S.W.3d at 328; *Matlock*, 902 S.W.2d at 386; *Gordon*, 584 S.W.2d at 658. More specifically, a document is not presumed to be invalid merely because a confidential relationship has been established; to the contrary, the presumption that arises is that the dominant party exercised undue influence over the mind and the will of the dependent party due to the existence of a confidential relationship. *See In re Estate of Price*, 273 S.W.3d at 125; *see also Brown v. Weik*, 725 S.W.2d at 945. Furthermore, the dominant party that is alleged to have obtained the execution of a document, such as the 2010 trust amendment at issue, is not precluded from proving that the resulting document was not the result of undue influence. Even though it is determined that a confidential relationship existed and a transaction followed by which the dominant party received a benefit, the dominant party may rebut the presumption of *undue influence* by clear and convincing evidence of the fairness of the transaction. *Childress*, 74 S.W.3d at 328; *Matlock*, 902 S.W.2d at 386. Indeed, contrary to the plaintiffs' contentions, our courts are to exercise the utmost caution before concluding that the execution of a deed, trust, will or other document should be invalidated. *Richmond*, 555 S.W.2d at 109.

With the above principles established, we proceed to consider plaintiffs' companion contention that the trial court erred in not instructing the jury that it *must* find the 2010 trust invalid unless it is proven that the decedent received independent advice before signing the 2010 trust amendment. Whether independent advice is essential in proving fairness is ordinarily determined with respect to "the nature of the confidence reposed, the nature of the transaction and the circumstances in each particular case." *Id*. at 108 (quoting *Roberts*, 166 S.W.2d at 651).

Contrary to the plaintiffs' assertion, proving that the decedent received independent advice is not the *only* means to establish the fairness of the transaction; it is merely one way to establish the fairness of a transaction. As our Supreme Court has noted, in *some circumstances* where it would be difficult to show the fairness of the transaction, the dominant party can only rebut the presumption with evidence of independent advice. *Richmond*, 555 S.W.2d at 108-09. Such circumstances particularly arise where a feeble

person impoverishes herself by the gift or the conveyance seems unnatural given the circumstances. *Id.* (citing *Roberts*, 166 S.W.2d at 651). Neither of those factors are in play in this case; thus, proving that the decedent received independent advice is not the *only* means to establish the fairness of the transaction at issue, that being the execution of the 2010 amendment to the trust. Accordingly, the trial court did not err by failing to instruct the jury that the *only* means by which Mr. Farmer could prove the fairness of the 2010 amendment to the decedent's trust was that the decedent received independent advice concerning the amendment to her trust.

We additionally note that Mr. Farmer offered evidence from which the jury could find that the decedent received independent advice from her attorney. Attorney Allison Thompson testified that she met with the decedent privately on two occasions, separate from others, and stated that she fully discussed the proposed 2010 amendment to the trust with the decedent. She also testified that the decedent appeared intelligent and aware of her intentions, that the decedent "very definitely" understood what she was doing, and did not appear to be under the influence of anyone. Ms. Thompson testified that the decedent was her client, that her professional obligation was to serve the decedent, and that she provided independent legal advice to the decedent.

Independent advice means that "the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interests of the donee as to be in a position to advise with the donor impartially and confidently as to the consequences to himself of his proposed benefactions." *Turner v. Leathers*, 232 S.W.2d 269, 271 (Tenn. 1950). Based on the undisputed evidence in the record, it was established that the decedent received independent advice and counsel from her attorney Allison Thompson prior to executing the 2010 amendment to the trust.

II. THE VERDICT: THE TRANSACTIONS WERE NOT THE RESULT OF UNDUE INFLUENCE

We now turn our attention to the issue Mr. Farmer insists is dispositive of this appeal: whether there is material evidence to support the jury's finding that he proved by clear and convincing evidence that the 2010 amendment to the decedent's trust was not the result of undue influence and that it was fair to the decedent.

The trial court gave the following instruction to the jury regarding the presumption of undue influence, which was the proper instruction regarding this issue:

> The existence of a confidential relationship followed by a transaction where the dominant party receives a benefit from the decedent creates a presumption

of undue influence. A presumption that may only be rebutted by clear and convincing evidence of the fairness of the transaction.

There is a presumption that a transaction is caused by undue influence if you find the following: One, a confidential relationship existed between the decedent and the person benefitting. And, two, the person benefitting was active in causing the transaction to occur and benefitted from it. This presumption may be overcome if the person benefitting from the transaction proves by clear and convincing evidence that the transactions were not the result of undue influence.

The jury verdict form provided to the jury contained the following interrogatory:

4.      Has Defendant Randy L. Farmer proven by clear and convincing evidence that under the totality of circumstances the 2010 trust amendment to the Linda Annette Farmer Revocable Living Trust of 2004 for the personal benefit of Defendant Randy L. Farmer was not the result of undue influence and was fair to Linda A. Farmer (deceased).

The jury instruction correctly stated the applicable legal principles that apply to the facts of this case. Further, the jury interrogatory was correctly fashioned to reflect that Mr. Farmer had the burden of proof to rebut the presumption of undue influence by establishing clear and convincing evidence that the transaction, the 2010 amendment to the trust, was fair to the decedent. Therefore, the jury instruction and interrogatory #4 correctly shifted the burden to Mr. Farmer to prove by clear and convincing evidence that the 2010 amendment to the trust was fair to the decedent. Based on these factors we have concluded that the jury instruction and jury interrogatory correctly and fairly informed the jury of the applicable legal principles. *See Wielgus v. Dover Indus.*, 39 S.W.3d 124, 131 (Tenn. Ct. App. 2001) (stating that jury instructions need not be perfect in every detail, just correct and fair).

Having been properly instructed, the jury found that Mr. Farmer had proven, by clear and convincing evidence, the fairness of the 2010 trust amendment. The jury's finding is supported by evidence we find material including the undisputed testimony of attorney Allison Thompson who testified that the decedent was her client, that she met privately with her client concerning the amendment on two occasions, and that she provided independent legal advice to her client by fully discussing the proposed 2010 amendment to the trust with her. Ms. Thompson also testified that her client was intelligent, that she was aware of her intentions, that she "very definitely" understood what she was doing, and that she did not appear to be under the influence of anyone. The record also reveals that the decedent was

-14-

aware that her sister Mrs. Parris was worth approximately three million dollars and that her brother Mr. Farmer and his wife possessed modest assets. Considering these facts and other evidence presented to the jury, we have determined the record contains material evidence that supports the jury's finding that the defendant Randy Farmer proved, upon clear and convincing evidence, that the 2010 amendment to the decedent's trust was not the result of undue influence and that it was fair to the decedent. For these reasons, we affirm the jury's finding that the 2010 amendment to the decedent's trust is valid.

## III. STANDING

Because we have determined that the 2010 trust amendment is valid, we shall now address whether the plaintiffs have standing to pursue the remainder of their claims.

Courts employ the doctrine of standing to determine whether a particular litigant is entitled to have a court decide the merits of a dispute or of particular issues. *Am. Civil Liberties Union of Tenn. v. Darnell*, 195 S.W.3d 612, 619-20 (Tenn. 2006) (citations omitted). The doctrine of standing precludes courts from adjudicating "an action at the instance of one whose rights have not been invaded or infringed." *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001), *perm. app. denied* (Tenn. April 30, 2001). The doctrine of standing restricts "[t]he exercise of judicial power . . . to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc*. 454 U.S. 464, 473 (1982).

To establish standing, a plaintiff must show three "indispensable" elements "by the same degree of evidence" as other matters on which the plaintiff bears the burden of proof. *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 767 (Tenn. Ct. App. 2002), *perm. app. denied* (Tenn. Sept. 9, 2002). First, a plaintiff must show a distinct and palpable injury: conjectural or hypothetical injuries are not sufficient. *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 55-56 (Tenn. Ct. App. 2004); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, a plaintiff must show a causal connection between the claimed injury and the challenged conduct. *Mayhew*, 46 S.W.3d at 767. The third and final element necessary to establish standing is a showing that the alleged injury is capable of being redressed by a favorable decision of the court. *Petty*, 91 S.W.3d at 767.

The plaintiffs are the Estate of Linda A. Farmer and Vicky Gamble and Paul Parris, III, acting as attorneys-in-fact on behalf of Doris Fay Parris. Under the 2010 trust amendment, which we have determined is valid, Mrs. Parris is entitled to receive a cash bequest of $5,000, and some of the decedent's nieces and nephews are entitled to more modest cash bequests; Mr. Farmer is the only other beneficiary, and he is the sole residuary

beneficiary of the trust. The parties do not dispute that the trust has sufficient funds to distribute the specific cash bequests.[4]

The validity of the decedent's Last Will and Testament is not contested, and the sole beneficiary of the will is the decedent's trust. We have affirmed the jury's finding that the 2010 amendment to the decedent's trust is valid; therefore, the trust is no longer contested. The Estate of Linda Farmer has no claims against the trust. Moreover, it is undisputed that the trust assets are more than sufficient to satisfy all specific bequests, and Mr. Farmer is the sole residuary beneficiary of the trust; therefore, the Estate of Linda Farmer has no standing to pursue the remaining claims on appeal.

All other claims against Randy Farmer are brought on behalf of Mrs. Parris. Each claim she asserts against Mr. Farmer pertains to acts or omissions that allegedly reduced the size of the estate by converting assets of the estate to himself or his daughter. These claims notwithstanding, the only bequest Mrs. Parris is entitled to receive under the 2010 amendment to the trust is a cash bequest of $5,000, and it is undisputed that the remaining trust funds are more than sufficient to satisfy that bequest. Therefore, Mrs. Parris cannot show that she has suffered a distinct and palpable injury due to Mr. Farmer's alleged acts of conversion, which is essential to establish standing. *See City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d at 55; *see also Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d at 767. Therefore, under the facts of this case, the plaintiffs no longer have standing to pursue the remaining claims. *See Estate of Hamilton v. Morris*, 67 S.W.3d 786, 797 (Tenn. Ct. App. 2001) (Plaintiffs were residuary beneficiaries under prior will, but the court found the residuary clause of current will to be valid, and, therefore, "this totally eliminated [plaintiffs] as beneficiaries of [decedent's] estate and, thus, they lacked standing to recover."); *Oram v. People's & Union Bank*, No. 85-307-II, 1986 WL 6061, at *3 (Tenn. Ct. App. May 29, 1986) (income beneficiaries did not suffer any loss from acts of trustee, and trustee not liable for its technical breach of duty).

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Appellants.

_____
FRANK G. CLEMENT, JR., JUDGE

_____

[4]As noted earlier, all of the decedent's assets that passed under her will poured over into the trust. Thus, any bequests pass under the 2010 amendment to the trust.